**UNITED STATES**

v.

**Staff Sergeant Robert J. MONROE, United States Air Force.**

**ACM 32592 (f rev).**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 5 Nov. 1996.

Decided 5 Feb. 1999.

Appellate Counsel for Appellant: Colonel Douglas H. Kohrt, Lieutenant Colonel Kim L. Sheffield, and Captain Harold M. Vaught.

Appellate Counsel for the United States: Colonel Brenda J. Hollis, Lieutenant Colonel Michael J. Breslin, and Major Allen G. Erickson.

Before SNYDER, Senior Judge, MORGAN and SENANDER, Appellate Military Judges.

## OPINION OF THE COURT UPON FURTHER REVIEW

SNYDER, Senior Judge:

Consistent with his conditional pleas of guilty, appellant was convicted by a general court-martial of violating a lawful general regulation, wrongfully and knowingly possessing three or more visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a), and using a common carrier to transmit and receive, via interstate and foreign commerce, obscene writings and computer graphics, in violation of 18 U.S.C. § 1462. Articles 92(a)(1) and 134, UCMJ, 10 U.S.C. §§ 892(a)(1) and 934. The military judge sentenced him to a bad-conduct discharge, confinement for 4 months, and reduction to E–1. The convening authority approved the sentence as adjudged, but waived the automatic forfeitures for the benefit of appellant's dependents. Appellant asserts two assignments of error. We grant relief on one but otherwise affirm.

In our original review of this case, we returned it for a new staff judge advocate recommendation and action of the convening authority. *United States v. Monroe,* ACM 32592, 1998 WL 378258 (A.F.Ct.Crim.App. May 14, 1998). Those actions having been accomplished, we now address the remaining assignments of error.

### I. Conditional Guilty Plea

Before addressing the assignments of error, we deem it necessary to comment on another facet of this case. Appellant's offer to the convening authority to plead guilty was conditioned upon his being able to plead conditionally so that he could preserve appellate review of a motion to suppress the results of a search. The convening authority accepted the offer. During the inquiry into appellant's understanding of his plea agreement with the convening authority, *see United States v. Green,* 1 M.J. 453 (C.M.A.1976);

*United States v. King,* 3 M.J. 458 (C.M.A. 1977), the military judge stated as follows:

> Okay. It also states that you are making a conditional guilty plea. That is, you are basically preserving your Motion to Suppress the evidence and, as you already know, I've denied that motion, but that motion is preserved on appeal now. Do you understand that?

This is the only place in the record where the military judge addressed the fact that appellant entered a conditional guilty plea. As a result, the military judge did not comply with Rule for Courts–Martial (R.C.M.) 910(a)(2), which reads in part as follows:

> With the approval *of the military judge* and the consent of the Government, an accused may enter a conditional plea of guilty, reserving the right, on further review or appeal, to review the adverse determination of any specified pretrial motion. . . .

(Emphasis added).

 If the accused prevails on the motion on appeal, he is entitled to withdraw the plea of guilty. *Id.* As the rule clearly states, R.C.M. 910(a)(2) does not give an accused an absolute right to enter a conditional guilty plea. *United States v. Forbes,* 19 M.J. 953, 954 (A.F.C.M.R.1985). Even if the government consents to a conditional guilty plea, the accused still must obtain the approval of the military judge. The clear intent of the rule is to conserve judicial resources. As such, we believe the drafters of R.C.M. 910(a)(2) contemplated the military judge's approval as being more than just a ministerial act. *See* Drafters Analysis, *MCM,* A21–56–57. Therefore, the military judge should, at a minimum, make findings on the record that:

(1) The offer is in writing and clearly details the motion which the accused wishes to preserve on appeal;

(2) The government's consent is in writing and signed by an official authorized to consent;

(3) The particular motion was fully litigated before the military judge; and,

(4) The motion is case dispositive.

 With regards to (1), the motion also should clearly set forth all the grounds on which it is based in order to hone the issue at the appellate level. *See, e.g., United States v. Tarleton,* 47 M.J. 170, 172–73 (1997). The Secretary has directed that a conditional guilty plea will be accepted only "when the issue preserved for appeal is case dispositive." Air Force Instruction (AFI) 51–201, *Administration of Military Justice,* ¶ 8.2 (3 October 1997). AFI 51–201 does not define "case dispositive." The term normally denotes that nothing remains to be resolved after resolution of the issue in controversy. Therefore, if a conditional guilty plea is to less than all specifications and charges, or the issue sought to be preserved does not render all of the government's available evidence inadmissible, then the issue in question is not case dispositive, and, if nonetheless approved by the military judge, the military judge should specifically state on the record why the conditional guilty plea is approved contrary to AFI 51–201. *See* Drafters Analysis, *MCM* at A21–56–57; *United States v. Maio,* 34 M.J. 215, 219 n. 3 (C.M.A.1992); *United States v. Pond,* 36 M.J. 1050, 1060 (A.F.C.M.R.1993); *United States v. Phillips,* 32 M.J. 955, 956 (A.F.C.M.R.1991). Further, the military judge also should ascertain the parties' positions with regards to subsequent proceedings and any remaining charge and specification should the accused prevail on appeal.

In the instant case, Charge I and its specification were not impacted by the motion to suppress, but, as noted, the record is silent on how the parties anticipate the case will proceed if appellant ultimately prevails. Appellant has two tiers of appeal remaining. For now, however, the case is not impacted by this matter. However, to insure that conditional guilty pleas accomplish their purpose, military judges should be sensitive to all of the requirements of R.C.M. 910(a)(2) and AFI 51–201. We now address the motion to suppress.

## II. Legality of Search

This case requires the law to add another paragraph to the "rules of the road" for the "information superhighway" and cyberspace. It is yet another testimony to the resiliency

and flexibility of the case-by-case incremental development concept we inherited from the Common Law, which emphasizes adherence to *stare decisis*. As our superior court noted in *United States v. Maxwell*, 45 M.J. 406, 410 (1996), new technologies present new challenges, but they are met by adapting existing legal concepts to them. *Maxwell* presented the issue of the expectation of privacy, if any, an electronic mail (e-mail) subscriber has *vis-à-vis* the contractual host server, which in Maxwell's case was America Online. In the instant case, we examine the expectation of privacy where the Government is the host server.

### A. Facts

Prior to appellant entering his pleas, trial defense counsel presented a timely motion to suppress the results of the search of appellant's dormitory room, in which his personal computer and accessories were seized. The military judge made the following findings:

1. In the fall of 1995, Osan Air Base had in place an electronic mail host, EMH, a computer owned by the United States Air Force and administered by the 51st Communications Squadron. The EMH allowed a user, through a log-on and a private password, [to] access the Defense Data Network and the Internet. Accounts were given on this computer for official business, although users were allowed to use it to send and receive limited textual and morale messages to and from friends and family.

2. Normally all in-coming e-mail files sent to the EMH are sent to the MQUEUE directory on the EMH. About every 15 minutes a computer program would read these files, sort them and send them to the e-mail account of the individual they are addressed to. If there is some sort of a defect with the files or they are too large, they are not sent out of the directory and simply accumulate there. If the file is still not sent out within 72 hours, the computer system is supposed to automatically delete them. However, on occasion, the system does not delete them because of various flukes in the software.

This impedes the EMH system, slowing it down greatly.

3. During the time frame in issue, Staff Sergeant Brian Carlson was the EMH administrator for the 51st Comm Squadron, and Staff Sergeant Daniel Hatcher was the base-wide area network administrator. On the 29th of November 1995, Staff Sergeant Carlson found that 59 files had been stuck in the MQUEUE directory for over 72 hours, some up to ten days. It is the job of the EMH administrator to monitor the flow of the e-mail traffic across the base. In an effort to identify the source of the problem, Staff Sergeants Carlson and Hatcher opened several of the files. They looked at the header of a few of the files and found that they were addressed to a user known as "monroer" and noticed that the image files were sent from newsgroups with such sexually oriented names as "erotica" and "sex." "[M]onroer" is the accused's account name.

4. To further determine why the 59 files didn't process and to clear the files from the system, Staff Sergeant Hatcher had the files moved to a directory outside the MQUEUE. He determined that 33 of the files contained graphic images. He transferred the image files to a separate computer and opened a few of them in a continuing effort to determine the cause of the system problem. He discovered the files revealed sexually explicit photographs of adult women.

5. Staff Sergeant Hatcher then needed to find out whether this pornographic material had been requested or whether Staff Sergeant Monroe had been the victim of a prank. To do this, Carlson and Hatcher opened the accused's e-mail account. They found one message the accused sent to "wsnet.com," the sender of the 59 files in question, reminding them to "send the file." They also found a message giving instructions on how to access material. It contained a listing of newsgroups on picture files entitled [with] such names

as "Lesbians," "Girlfriends," "Lingerie," and "Great Ass Paulina." Convinced that the accused had not been the victim of a prank, on 30 November 1995, Hatcher decided to report the matter to his chain of command. That day, it also came to the attention of the AFOSI. Hatcher turned over to Special Agent Dewayne Duff two diskettes [which] contained 33 image files, the two printouts of the two messages found in the accused's e-mail account and an MFR discussing how he came to discover these files.

6. On 6 December 1995, Hatcher found 12 additional files stuck in the MQUEUE directory. Four were directed to the accused and eight were directed to a library account. Hatcher opened the file headers and found that they were from the same sexually oriented newsgroups as the earlier files. These files were turned over to Special Agent Duff on 8 December 1995.

7. On 11 December 1995, Special Agent Duff took a copy of the original pornographic images to Captain Taylor, Chief of Military Justice at Osan Air Base, and Lieutenant Colonel Wise, the Staff Judge Advocate. They viewed the images and related that a substantive OSI investigation was appropriate. Also on 11 December 1995, Special Agent Duff received an MFR from the accused's first sergeant, Master Sergeant Wilburn, indicating that the accused had an e-mail account set up and that he believes he had a computer system.

8. On 12 December 1995, Special Agent Duff obtained a verbal search authorization from Colonel James Green, the base search authority, to search the building where the accused worked. The search authorization was never used when it was ascertained that the accused did not have access to any government computers at his work site capable of receiving electronic mail transfers.

9. On 18 December 1995, Special Agent Duff spoke with Master Sergeant Wilburn who told him he believed the accused had a computer in his dorm room. Wilburn based this belief on statements by the accused that he was working on his computer.

10. On 19 December 1995, Special Agent Duff [briefed] Captain Taylor, Chief of Military Justice, on the status of investigation to date. She opined that probable cause existed to seize all computer data media within the accused's access in his dormitory room in Building 720, Room 107, Osan Air Base, Republic of Korea. Special Agent Duff signed an affidavit, attachment "10" to Appellate Exhibit I, and Colonel Green signed an AF Form 1176 giving authority to search the quarters of Staff Sergeant Monroe and seize "all computer related data media suspected to contain pornography or child pornography."

11. As of 19 December 1995, no child pornography had been found in the 33 image files.

12. On 21 December 1995, AFOSI searched the accused's dormitory room. All computer or computer related items, including all hardware and software, 218 floppy disks, eight pages of travel voucher documents with writing on them and two pages of notes were seized.

13. The court finds that all the actions of Staff Sergeants Hatcher and Carlson were for a legitimate governmental purpose pursuant to their duties in the 51st Comm Squadron. At no time did they act as government agents as under M.R.E. 311(c). Therefore, their actions did not constitute an unlawful search.

14. Any person logging on to the EMH at Osan was getting a banner message stating, "USERS LOGGING ON TO THIS SYSTEM CONSENT TO MONITORING BY THE HOSTADM."

15. The task of the issuing magistrate is simply to make a practical common sense decision whether, given all the circumstances set forth in the affida-

vit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place. (See *New York v. P.J. Video, Inc.,* 106 Supreme Court at 1615.)

16. It is well settled that a magistrate's determination of probable cause is accorded great deference. This deference does not preclude inquiry into the knowing or reckless falsity of the affidavit on which the determination was based and the affidavits must provide the magistrate with a substantial basis for determining the existence of probable cause. (See *United States versus Leon* at 104 Supreme Court 3416.)

17. I find that the totality of the circumstances reflected that the evidence presented to Colonel Green, the search authority, that is the facts presented in the affidavit of Special Agent Duff, establish that the magistrate issued search authorization upon such probable cause within the intent and meaning of the Fourth Amendment. Special Agent Duff articulated how the files in question had come to the attention of Staff Sergeants Carlson and Hatcher and what investigative steps he had taken. It stated that the image files contained graphic pornographic photographs and that the accused was the addressee. It stated that the accused did not have access to any government computer system with the capability of making the file transfers or accessing the base e-mail host through a data modem. It stated that the accused's first sergeant believed, based on statements made by the accused, that he owned a personal computer in his dormitory room. It stated that the accused had an account set up and operated an e-mail account on his system. It stated that the Chief of Military Justice opined that probable cause existed to search the accused's dormitory room.

18. I find that any failure to give Colonel Green a more detailed description of exactly what was depicted in the photographs or to define "obscenity" is not fatal to this search authorization. This case deals with photographs rather than motion pictures or literature. Photographs do not require the scrutiny necessary with movies and books where the full context is more critical. 18 U.S.C. § 1462 proscribes introduction of any obscene, lewd, lascivious, filthy or other matter of an indecent character. Colonel Green was presented with sufficient information to find probable cause to authorize the search of the accused's room.

19. I find that the fact that the authorization also includes seizure of "child pornography" when there had been no evidence that the accused had sought to introduce child pornography is not fatal. The authorization also authorized seizure of pornography which, of course, would have required the seizure of pornography depicting children.

20. Even assuming *arguendo* the evidence obtained was the result of an unlawful search or seizure, the evidence is nevertheless admissible under M.R.E. 311(b)(3). The exclusionary rule is designed to deter a policeman's misconduct. I find no misconduct on the part of law enforcement officers in this case. The advice of a Staff Judge Advocate was sought and [his advice] received. That advice was conveyed to the search authority. The behavior of law enforcement and their reliance on Colonel Green's probable cause determination and on the technical sufficiency of the search authorization was objectively reasonable. At no time did Colonel Green abandon his neutral and detached role. Therefore, the defense Motion to Suppress all evidence seized from the accused's dormitory room is denied.

### B. Discussion

Trial defense counsel attacked the search on two fronts by asserting: 1) the system

administrators exceeded the scope of their duties when they opened the original 59 files instead of deleting them, thereby progressing from merely monitoring the system to "investigating" appellant; and, 2) the search magistrate had insufficient information from which to conclude that probable cause existed to believe appellant was in possession of pornographic materials. Appellate defense counsel continue to advocate these themes before this Court. We disagree with their averments.

 A military judge's ruling on the admission or exclusion of evidence, including rulings on motions to suppress, are reviewed for an abuse of discretion. *United States v. Ayala*, 43 M.J. 296 (1995); *United States v. Agosto*, 43 M.J. 745, 748 (A.F.Ct.Crim.App. 1995). As search issues generally are mixed questions of fact and law, we review a military judge's findings of fact under a clearly erroneous standard, and we review the military judge's conclusions of law under a *de novo* standard of review. A military judge abuses his or her discretion on a motion to suppress only if the factual findings are clearly erroneous or the law is applied erroneously. *Ayala*, 43 M.J. at 298; *United States v. Burris*, 21 M.J. 140, 144 (C.M.A. 1985). Finding the military judge's findings in full accord with the evidence of record, we adopt them as our own. Article 66(c), UCMJ, 10 U.S.C. § 866(c).

 Probable cause exists when there is sufficient information to provide the authorizing official a reasonable belief that the person, property, or evidence sought is located in the place or on the person to be searched. Mil.R.Evid. 315(f)(2); *United States v. Mix*, 35 M.J. 283 (C.M.A.1992). Whether probable cause exists for a commander or search magistrate to issue an authorization to search is determined by the totality of the circumstances presented to the magistrate. *Illinois v. Gates*, 462 U.S. 213, 233, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *accord United States v. Hester*, 47 M.J. 461, 463 (1998). In *Gates*, the Court emphasized the fact that the law does not demand that a magistrate make technical, legal determinations when deciding whether to issue a warrant. Instead, only a practical, common sense assessment is re-

quired, because the central question is whether there is probable cause, not whether there is proof beyond a reasonable doubt. *See Gates*, 462 U.S. at 231, 76 L.Ed.2d 527 and cases cited therein. Searches authorized by magistrates are preferable to searches conducted under other bases. Consequently, a magistrate's determination that probable cause existed is entitled to great deference. *See United States v. Leon*, 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Hester*, 47 M.J. at 466 (Gierke, J., concurring in part and in the result); *United States v. Lopez*, 35 M.J. 35, 49–50 (C.M.A.1992) (Wiss, J., concurring in the result).

We note that, since *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), there appears to be uncertainty in the federal circuit courts of appeals as to how much deference, if any, is to be granted a magistrate's determination of probable cause, notwithstanding the fact that *Ornelas* involved the warrantless search of an automobile. *See United States v. McKinney*, 143 F.3d 325 (7th Cir.1998); *United States v. Khounsavanh*, 113 F.3d 279 (1st Cir.1997); *United States v. Sprinkle*, 106 F.3d 613 (4th Cir.1997); *United States v. Johnigan*, 90 F.3d 1332 (8th Cir.1996); *United States v. Procopio*, 88 F.3d 21 (1st Cir. 1996). This uncertainty also appears to be germinating within our superior court. *See, e.g., United States v. Light*, 48 M.J. 187, 192 (1998) (Sullivan, J., concurring in the result); *Hester*, 47 M.J. at 464–65; *Id.* at 466 (Gierke, J., concurring in part and in the result).

 Nonetheless, until our superior court clearly holds that we must conduct a full *de novo* review of whether there was probable cause to search, we will continue to grant deference to a search magistrate's determination of probable cause. *Light*, 48 M.J. at 189–90; *Hester*, 47 M.J. at 466 (Gierke, J., concurring in part and in the result); *Id.* (Sullivan, J., concurring in the result). In light of this deference, this Court's *de novo* review is confined to whether the military judge was correct in ruling that the search magistrate had a substantial basis for finding probable cause existed to search appellant's residence. *United States v. Figueroa*, 35 M.J. 54, 56 (C.M.A.1992). Although we pro-

ceed on the basis of deferential review, we observe that, even on the basis of a full *de novo* review, we would conclude that the information given to Colonel (Col) Green provided probable cause to authorize the search of appellant's dormitory room for his personal computer and its contents. *Hester,* 47 M.J. at 463.

As noted, *ante,* in addition to arguing that the magistrate did not have probable cause to authorize the search, appellant also argues that the information on which the magistrate relied was obtained by an unlawful search and, *ergo,* the evidence seized from his quarters is derivative evidence of that illegality. To address appellant's first averment, we first must determine if he manifested a subjective expectation of privacy in his use of the base e-mail host server (EMH). If so, we must then decide whether that expectation of privacy is objectively reasonable with regards to his "host" or his e-mail mailbox. This issue is resolved on a *de novo* basis. *Maxwell,* 45 M.J. at 417.

In *Maxwell,* the Court held that a subscriber has a reasonable expectation of privacy in an e-mail box which can be overcome only by a warrant issued upon probable cause. *Id.* That holding, however, was confined specifically to a commercial, contractual scenario, and the Court cautioned that, "[e]xpectations of privacy in e-mail transmissions depend in large part on the type of e-mail involved and the intended recipient." *Maxwell,* 45 M.J. at 418–19. In the instant case, we are faced with the insular setting of a government system which acted as a gateway between its users and the internet and which had known specific limitations on use.

Sergeant Hatcher testified that all "personal" mailboxes were issued for official business only. The only exception was that the holder of a mailbox could send and receive health and morale messages to and from family and friends in text form only. On cross-examination, defense counsel suggested that anyone assigned to Osan could obtain an e-mail account merely for the asking, but Sergeant Hatcher denied knowledge of such a liberal rule, and no evidence contrary to his testimony was submitted. Therefore, when this fact is combined with the fact that all

users of the system received notice that the system was subject to monitoring each time they logged on, we hold that appellant had no recognizable, objective expectation of privacy in e-mail which transited the Osan AB EMH. *See Maxwell,* 45 M.J. at 417.

Appellant's illicit mail had clogged the system, a risk he assumed when he caused large graphics files to be sent to him via an obsolete system and in contravention of the base network's rules. Traditional search and seizure law always has upheld the search of personal property which is found in a location where it might impede an official function. *See United States v. Torres,* 46 C.M.R. 96, 1973 WL 14456 (C.M.A.1973); *see also United States v. Battles,* 25 M.J. 58 (C.M.A.1987). Further, even telephone conversations inadvertently overheard while performing official duties have been upheld as nonviolative of the Fourth Amendment. *United States v. Sturdivant,* 13 M.J. 323 (C.M.A.1982) (on telephone line with five extensions, designated for official use only, first sergeant did not unlawfully intercept call when he picked up to see if call was for him and heard drug transaction discussed and continued to listen).

Therefore, appellant had no reasonable expectation of privacy in the files which became lodged in the Osan AB EMH, which means that Sergeants Hatcher and Carlson committed no illegality when they moved them to a separate work station and opened them. This does not, however, fully address the matter of his "personal" e-mail mailbox.

In view of the fact that the mailbox was issued to appellant via official channels for performance of his official duties, and restricted unofficial personal use, his electronic mailbox was akin to other types of government property routinely designated for or assigned to military personnel for performance of their official duties. One does not acquire a reasonable expectation of privacy in government property designated or assigned under these circumstances. *United States v. Muniz,* 23 M.J. 201 (C.M.A.1987); *United States v. Weshenfelder,* 43 C.M.R. 256, 261–62, 1971 WL 12773 (C.M.A.1971). Depending upon the person involved and his or her authority, there is no expectation of

privacy even if the government property in question is capable of being secured. *Muniz,* 23 M.J. at 204–6. Appellant's mailbox with the Osan EMH, however, was not truly secure.

In addition to facts reflected in the military judge's findings, Sergeant Hatcher also testified that, his cautious approach notwithstanding, as basewide system administrator he was authorized free and unlimited access to the system to ensure it operated at maximum efficiency. This authorization included access to "personal" e-mail accounts and mailboxes. He described how the base e-mail system, including the accounts and mailboxes, were actually located in the government computer which was the server and comprised the EMH. As such, appellant's mailbox was neither in his possession nor under his control. Although the administrator assigned a mailbox holder's initial password and the holder could, and was encouraged to, change the password, the EMH administrator knew to whom each password belonged and could access every mailbox. Article 66(c), UCMJ, 10 U.S.C. § 866(c). What this means is that the existence of a personal password is only of passing significance, because appellant was not allowed a password in order to exclude the EMH administrator, but potential interlopers only. In sum, the banner which all users of the system saw whenever they logged on was more than a reminder of potential monitoring. It also was a reminder that the Osan EMH was a government system in its entirety, and the use thereof was restricted.

In light of these facts, we hold that appellant also did not have a reasonable expectation of privacy in his e-mail box, at least as regards his superiors and the EMH administrator and his/her superiors. Appellant's situation actually was less protected than that recognized for desks in the work area. Desks in the work area are not immune from searches by supervisors or other authorized persons seeking official information, unless there is objective evidence that someone with authority to do so has led the subordinate to reasonably believe that a reasonable expectation of privacy has been acquired. *See Muniz,* 23 M.J. at 205, and cases cited therein.

As for personal items in the desk, it is still an open question as to whether the needs of the military militate against recognition of an expectation of privacy in personal items the user may have placed in the desk such as a purse, attaché case, letters or the like. *See Muniz,* 23 M.J. at 208 (Everett, C.J., concurring in the result). However, we need not address that issue in the instant case.

Using the analogy of a work area desk and the precedents applicable thereto and the facts of the instant case, we believe appellant's e-mail box within the EMH was most comparable to an unsecured file cabinet in his superiors' work area in which an unsecured drawer was designated for his use in performing his official duties with the understanding that his superiors had free access to the cabinet, including his drawer. Under these constraints, there would be no reasonable expectation of privacy in any personal items stored within. *See, e.g., Battles,* 25 M.J. at 60. As such, he had no reasonable expectation of privacy in his e-mail box for Sergeants Hatcher and Carlson to violate.

Even were we to assume appellant acquired a reasonable expectation of privacy, it still would not benefit him. First, Sergeants Hatcher and Carlson knew that "wsnet.com" sent "monroer" the illicit graphic files. Further, there is nothing in the facts to indicate that they read any text messages in appellant's mailbox other than ones to or from "wsnet.com." Second, the messages to and from "wsnet.com" did not meet the criteria for authorized personal use. Consequently, in view of our holding above, appellant did not have a reasonable expectation of privacy in those messages. A contrary conclusion would not change the result.

Addressing Sergeants Carlson's and Hatcher's actions, trial defense counsel argued in his brief on the motion that even "if Sergeant Monroe consented to monitoring he didn't consent to investigating." However, we agree with the military judge that there was no illegality with regards to Sergeants Carlson's and Hatcher's actions. It matters not what methods they could have used which may have precluded their discovery of appellant's crimes. What does matter is that their actions were well within their official

duties. They were doing what they had a responsibility to do in order to insure the base network was operating at maximum efficiency, and all of their actions were taken to achieve that end. *See Muniz*, 23 M.J. at 205; *Sturdivant*, 13 M.J. at 329. Accessing appellant's mailbox to determine if appellant requested the materials in issue was done to find out if appellant was the victim of a prank. There also is the fact Sergeants Hatcher and Carlson knew the graphic files were addressed to "monroer" before they entered appellant's mailbox. They obviously knew who "monroer" was or they would not have known whose mailbox to enter. In view of the information known to them and the actions they already had taken, there is no doubt that appellant's mailbox inevitably would have been searched. Mil.R.Evid. 311(b)(2). Finally, even if we exclude the evidence that appellant requested the images, there still is more than sufficient evidence to consider on the issue of probable cause. As a result, it does not impact our ultimate finding.

In addition to Sergeants Hatcher and Carlson having acted within the scope of their official duties, there also is the fact that the evidence overwhelmingly establishes that, for purposes of Mil.R.Evid. 311, they were private parties. They had no law enforcement connections at all, at least up until the point where Sergeant Hatcher initially surrendered the first 33 images to investigators, which is the information on which the authorization to search was based. There being no impropriety in these actions, the information provided by them was properly presented to, and considered by, the base search magistrate, Col Green.

Our holding that appellant did not possess an objective expectation of privacy in the areas indicated which this Court recognizes normally would dispose of this issue. However, because investigators searched appellant's dormitory room, an area where he did have a reasonable expectation of privacy, we will proceed to the issue of whether the information provided Col Green constituted a substantial basis for authorizing the search.

■ Before addressing appellant's main assertion, we first address his argument that the search request was defective because it applied to search for evidence of child pornography even though, at that point in the investigation, there was no evidence that appellant had downloaded child pornography. In addition to requesting to search for evidence of child pornography, the Air Force Form 1176 submitted by Special Agent (SA) Duff reflects that appellant was suspected of transmitting and receiving obscene materials in violation of federal law, and requested to "seize all computer related data media suspected to contain pornography or child pornography."

This request more than meets the requirement that it be specific with regards to the place to be searched and the items sought to be seized. Mil.R.Evid. 315(b)(1); *see United States v. Thompson*, 33 M.J. 218 (C.M.A. 1991). We agree with the military judge that child pornography is reasonably included within the general context of pornography, and including it did not render the search request and authorization overly broad. In fact, the purpose of the search would have been sufficient if SA Duff had done no more than state it was believed that appellant's room and computer equipment contained additional evidence of the fact that appellant had used government equipment for illicit purposes.

Appellant's main argument is that the affidavit in question violates the Supreme Court's guidelines for seizing materials presumptively protected by the First Amendment, in that SA Duff's affidavit contained only a conclusory allegation that the graphic images in question were obscene. Further, appellant avers, there was no specific information from which Col Green could independently conclude that the graphic images in question were obscene. *See New York v. P.J. Video, Inc.*, 475 U.S. 868, 106 S.Ct. 1610, 89 L.Ed.2d 871 (1986). The military judge distinguished *P.J. Video* in his findings, stating, "[p]hotographs do not require the scrutiny necessary with movies and books where the full context is more critical."

*P.J. Video* did not make new law but refused to expand the parameters of probable cause. The Supreme Court's core holding was that the probable cause requirement or

threshold for materials presumptively protected by the First Amendment is no higher or lower than that for "warrant applications generally." *P.J. Video*, 475 U.S. at 875, 106 S.Ct. 1610. That said, the Court restated the requirement that the magistrate be provided sufficient information to make an independent determination under the totality of circumstances standard. *Id.* at 876–77, 106 S.Ct. 1610. This also has long been the rule in military practice. "The authorizing official cannot rest on an unexplained conclusion of even the person seeking the authority." *United States v. Lidle*, 45 C.M.R. 229, 231, 1972 WL 14162 (C.M.A.1972) (citations omitted). The military judge was correct when he observed that photographs, unlike novels or movies, speak for themselves without regard to context. However, the authorizing official must still be informed of what the photographs sought to be seized depict in order to make an independent determination. *P.J. Video*, 475 U.S. at 876–77, 106 S.Ct. 1610; *see Lidle*, 45 C.M.R. at 231. In the instant case, we hold that the required standard was met.

 In addition to avowing that the chief of military justice, Captain (Capt) Taylor, had viewed all of the "pornographic images" and opined probable cause existed, the third paragraph of SA Duff's affidavit also states that, "Hatcher opened several of the files . . . [and] observed that the files contained images of *graphic pornographic photographs*." (emphasis added). Words are given their ordinary meaning, *Diamond v. Diehr*, 450 U.S. 175, 182, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981), quoting *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979), and magistrates are required only to make common sense determinations. We hold that the emphasized words are not merely conclusory but communicate to the average reasonable person that the photographs in question in all probability depicted obscenity as legally defined. Consequently, we find that Col Green had a substantial basis for authorizing the search of appellant's dormitory room for his personal computer and accessories and seizure thereof.

Before continuing, we note for our field staff judge advocates that this case repre-

sents borderline sufficiency. Simply attaching a couple of the graphic images downloaded or specifically describing the sexual acts depicted would have averted any issue regarding the obscene nature of the images. *See P.J. Video*, 475 U.S. at 877, 106 S.Ct. 1610.

We also agree with the military judge that, even if there was a technical, legal deficiency in SA Duff's affidavit, the good faith exception is fully applicable to this case. SA Duff sought legal guidance throughout his investigation, including having Capt Taylor personally review and observe the graphic images appellant requested and Sergeant Hatcher caused to be downloaded. There is nothing in the record to support an absence of good faith on SA Duff's part. In fact, the record reflects restraint on the part of investigators, as indicated by the fact that they did not execute an earlier authorization to search appellant's work area after they learned he did not have access to a computer there. As for Col Green, there was no reason for him to view SA Duff's affidavit as unreasonable on its face. SA Duff fully identified the source of his information and also coordinated closely with the base legal office. Consequently, Col Green's actions also qualify for the good faith exception. Mil.R.Evid. 311(b)(3); *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

### III. *Ex Post Facto*

This issue was decided in appellant's favor in *United States v. Gorski*, 47 M.J. 370 (1997). All of appellant's offenses occurred prior to 1 April 1996, the effective date of the amended Article 57(a), UCMJ, 10 U.S.C. § 857(a), and the new Article 58b, UCMJ, 10 U.S.C. § 858b. We will direct administrative relief in our decretal paragraph with regards to the effective date of appellant's reduction in rank. The automatic forfeitures mandated by Article 58b are not applicable to appellant. *Gorski*, 47 M.J. at 373–75. Therefore, there were no forfeitures for the convening authority to waive for the benefit of appellant's dependents. That, however, is a matter for fiscal authorities to sort out.

### IV. Decretal

The execution of any reduction in grade prior to the date of the convening authority's

action pursuant to Article 57(a), UCMJ, and the collection or waiver of forfeitures pursuant to Article 58b, UCMJ, is declared to be without legal effect. Any such forfeitures already collected from appellant will be restored at the appropriate pay grade. The record of trial is returned to The Judge Advocate General for appropriate action. The case need not be returned to this Court following administrative correction unless further appellate review is required.

Accordingly, the findings and sentence are correct in law and fact, and are hereby

AFFIRMED.

Judges MORGAN and SENANDER concur.*

* Judge Morgan participated in this decision prior to his retirement.